UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 15-147 (DWF/FLN)

                    Plaintiff,

          v.                                                 **REPORT AND
                                                             RECOMMENDATION**

Edgar Edward Gonzalez (7),

                    Defendant.

_____

Thomas Hollenhorst, Assistant United States Attorney, for Plaintiff.
Paul Engh for Defendant Edgar Edward Gonzalez.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on December 2, 2015 on Defendant Edgar Gonzalez's pretrial suppression motion (ECF No. 146). This matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. At the hearing, the Government entered seven exhibits into evidence and called three witnesses.[1] For the reasons that follow, the Court recommends that Defendant's motion be **DENIED**.

## I. INTRODUCTION

The Superseding Indictment ("Indictment") charges Defendant and others with conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. ECF No. 110 at 1. Defendant is also charged with two counts of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2, and two counts of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and

---

[1] The Government's exhibits and witnesses are outlined in an Exhibit and Witness List posted to CM/ECF. *See* ECF No. 187.

18 U.S.C. § 2. *Id.* at 1–3. Defendant now seeks to suppress various pieces of evidence that were obtained pursuant to searches of his vehicles, property, and residence. Mot. to Suppress Searches and Seizures, ECF No. 146.

## II. FINDINGS OF FACT

At the motions hearing, Special Agent Andrew Mento, Jr. testified regarding an investigation into the distribution of methamphetamine in the Twin Cities. According to Mento, he received information in March 2015 that an individual was distributing methamphetamine in the St. Paul area. He then arranged for multiple controlled purchases of methamphetamine with an undercover officer. One of these purchases occurred on March 24, 2015 between the undercover officer and co-Defendant Ramon Nava-Navarette. Immediately prior to the purchase, the undercover officer was instructed to meet the seller at an apartment building near 8xx Hazel Avenue North in St. Paul. The officer arrived at this location with Nava-Navarette in the vehicle, and a 2008 black Jeep Liberty arrived at the location a short while later. It was later determined that this Jeep was registered to Defendant Gonzalez with his residence listed as 3xxx Humboldt Avenue North in Minneapolis.

Police officers observed an individual who appeared to be Gonzalez exit the Jeep. Law enforcement believed this person was Gonzalez based on previous surveillance and Gonzalez's driver's license photograph. At this point, Nava-Navarette exited the vehicle, and he and Gonzalez returned to the Jeep. Gonzalez handed Nava-Navarette a container of methamphetamine that was wrapped inside a plastic bag. Nava-Navarette then passed this bag to the undercover officer. After the transaction, officers observed the Jeep return to the residence located at 3xxx Humboldt Avenue North.

According to Mento, the plastic bag containing methamphetamine was from the Lacoste

store at the Mall of America. In addition to the container of drugs, officers found a receipt in the bag for a shirt that was purchased from the Lacoste store on March 23, 2015. Mento went to the Lacoste store, checked the store's surveillance video, and observed an individual who appeared to be Gonzalez purchase the shirt shown on the receipt. Mento then obtained a higher quality photograph of the individual from Mall of America security, which, according to Mento, clearly showed that it was Gonzalez who purchased the shirt.

Following this March 24, 2015 transaction, law enforcement obtained a GPS tracker warrant for the 2008 Jeep Liberty. The tracker data revealed that the Jeep was in the Minneapolis area in early April. On April 7, 2015, the Jeep left Minnesota and arrived in Phoenix, Arizona on April 9, 2015. According to Mento, Arizona is a known source for methamphetamine because of its location on the border of Mexico.

While in Arizona, the vehicle traveled to multiple hotels and to at least one financial institution. On April 19, 2015, the vehicle left Arizona and began traveling back to Minnesota. Given that the vehicle had already been involved in the March 24, 2015 drug transaction, Mento stated that they suspected that the Jeep was being used to transport methamphetamine from Arizona back to Minnesota. Officers set up surveillance and contacted the Minnesota State Patrol to be on the lookout for this vehicle.

On April 20, 2015, the vehicle was observed traveling northbound on Interstate 35 ("I-35") in southern Minnesota. According to Special Agent Michael Flanagan of the Minnesota Bureau of Criminal Apprehension, who was working as a Minnesota State Patrol Trooper at the time, he was told to be on the lookout for a 2008 Jeep Liberty that was purportedly involved in the transportation of large quantities of narcotics. He was instructed by Mento to stop the vehicle if he observed some

sort of traffic violation.

Flanagan was parked in the median of I-35 near Albert Lea when he first saw the Jeep. The Jeep was towing a small trailer. Flanagan followed the Jeep for approximately four miles. During this time, he observed that the trailer was offset of the center of the vehicle by approximately one foot. Due to this misalignment, Flanagan noticed the wheels of the trailer cross over the lane stripe on several occasions. Flanagan stated that this was a violation of Minnesota law (unsafe driving, unable to maintain lane). Flanagan also stated that the trailer was not safe to be traveling on the roadway.

Flanagan initiated a traffic stop of the Jeep at approximately 7:10 p.m. As he approached the vehicle on the passenger side, he noticed a strong smell of air fresheners. When he reached the vehicle, he observed multiple new air fresheners sticking out of air vents, as well as a new air freshener hanging from the steering column. Flanagan stated that in his experience, many individuals involved in the transportation of large quantities of narcotics use air fresheners to mask the odor of drugs. Flanagan requested the license of the driver, who was later identified as co-Defendant Florencio Molina-Gonzalez. Molina-Gonzalez handed Flanagan an East Texas identification card, which was not a valid driver's license. At that point, Flanagan asked the passenger, who was later identified as co-Defendant Juan Carlos Candela, if he had a driver's license. During this interaction, neither individual would make eye contact with Flanagan. According to Flanagan, Candela fumbled through his wallet, and he eventually produced an Arizona driver's license. Flanagan later determined, however, that Candela's license was suspended. In response to a question by Flanagan, Molina-Gonzalez admitted that he did not own the Jeep.

Flanagan then went back to his squad car to determine who owned the vehicle and to issue

a citation. It was during this time that he confirmed that the vehicle was registered to Gonzalez and listed the 3xxx Humboldt Avenue residence as the registered address. Flanagan returned to the Jeep, where he issued a citation for the traffic violation.

After issuing the citation, he asked for Molina-Gonzalez's consent to search the vehicle. Realizing that Molina-Gonzalez's English was not very strong, Flanagan requested Candela, who spoke both English and Spanish, to translate for him. Flanagan had Candela explain to Molina-Gonzalez both the traffic citation and his request to search the vehicle. Flanagan then presented both Candela and Molina-Gonzalez with a standard consent form that was printed in both English and Spanish. *See* Gov. Ex. 8. According to Flanagan, Candela read the sheet to Molina-Gonzalez and they both consented to a search of the vehicle. The consent form was signed by Candela and Molina-Gonzalez at approximately 7:25 p.m.

After receiving consent to search the vehicle, Flanagan, who had a certified narcotics detection K-9 unit with him, ran his canine around the perimeter of the vehicle. The canine alerted to illegal narcotics inside of the vehicle. Flanagan then searched the interior of the vehicle, where he observed that numerous interior panels had been tampered with. He also located a socket wrench with a small amount of grease on it that could be used to remove the panel's screws. Based on this initial search, Flanagan believed that the vehicle contained a hidden compartment, and the Jeep needed to be taken to a separate, safer location for a more comprehensive search.

At some point during the traffic stop, Mento, who was monitoring the stop, advised Flanagan that a white Honda Odyssey van was observed driving past the location where the Jeep was stopped. According to Mento, he noticed that the Honda had pulled over to the shoulder of the interstate about one mile north of the location of the Jeep. The Honda then turned around, headed south on the interstate, and drove back past the Jeep's location. It then turned around again, stopped, and faced

5

the area of the traffic stop. It appeared to Flanagan and Mento that the van was monitoring the traffic stop. Flanagan advised his partner, State Trooper Eric Labere, to be on the lookout for this van. Flanagan stated that in his experience, there are usually two vehicles involved when transporting narcotics: a lead car and a follow car.

Labere testified at the motions hearing that he was instructed to initiate a traffic stop of the Honda if he could find a reason to lawfully stop the vehicle. Labere stated that he began following the Honda once it again started traveling north on I-35. He activated his radar, which indicated that the Honda was traveling at 75 mph. The speed limit on that stretch of I-35 was 70 mph. Labere then initiated a traffic stop at approximately 7:46 p.m. He approached the vehicle on the passenger side, and observed that there were two occupants in the van. The driver was Evelyn Mejia and the passenger was co-Defendant Alfonso Ayala, Jr.

Labere testified that at some point during the stop he asked Mejia to step outside of her vehicle. At this point, Labere gave her a warning for speeding, returned her registration and insurance information, and asked if she had any questions. She said no. He then sought permission to ask Mejia some additional questions, and she said that he could. Labere asked Mejia whether she had any drugs or large quantities of currency in the vehicle. She said no and consented to a search of the van. At that point, Labere had a similar discussion with Ayala, who also consented to the search. According to Labere, Mejia and Ayala's consent occurred approximately 10 to 15 minutes after the initial stop began.

At some point during the initial traffic stop of the van, Flanagan arrived on the scene and ran the van's license plate number. Records showed that the van was registered to the same address to which the Jeep was registered (i.e., the 3xxx Humboldt Avenue address). This further raised Flanagan's suspicion that the two vehicles were acting in concert. Flanagan stated that after Labere

6

received consent to search the van, Flanagan ran his canine around the exterior of the van. The canine alerted to the presence of narcotics. Flanagan then searched the interior of the van, where he observed that several of the interior panels had been removed and the bolts of the seats had been tampered with and removed. This search took approximately 15 to 20 minutes. Believing there were narcotics inside the vehicle due to the alert by the canine and the tampering visible on the inside of the van, the officers decided to obtain a warrant to conduct a full search of the van.

Both the Honda and the Jeep were removed from the side of the road and brought to a separate location to conduct the full search. The Honda was removed at approximately 8:26 p.m. and the Jeep was removed about 20 minutes prior to that. Warrants to search both vehicles were then obtained by 11:15 p.m. The search of the Jeep uncovered a socket set, while the search of the Honda uncovered a large quantity of methamphetamine.

### III. CONCLUSIONS OF LAW

#### A.    Duration of Traffic Stops

Gonzalez first moves to suppress the evidence obtained from both the Jeep Liberty and the Honda Odyssey pursuant to the searches conducted on April 20, 2015. ECF No. 146. Although Gonzalez appears to concede that the traffic stops themselves were lawful, Gonzalez argues that law enforcement officers unlawfully prolonged the traffic stop beyond the time reasonably required to issue a traffic citation. Mem. in Supp. 1–2, ECF No. 182 (citing *Rodriguez v. United States*, 135 S. Ct. 1609 (2015)). In response, the Government argues that because Gonzalez was not present for these searches, he lacks standing to contest them. Opp'n Mem. 4–7, ECF No. 185. Even if Gonzalez did have standing, however, the Government contends that the searches were lawful because all occupants consented to the searches. *Id.* at 7–8.

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*,

7

135 S. Ct. at 1614. Given that traffic stops constitute a relatively brief encounter with law enforcement, "a routine traffic stop is 'more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Id.* (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 684 (1985)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

In *Rodriguez*, the Supreme Court addressed the situation where an officer conducts a canine sniff of a vehicle after the officer had completed the traffic stop. In that case, a police officer stopped the defendant's vehicle at approximately 12:06 a.m. after the officer observed the vehicle veer onto the shoulder of the highway. *Id.* at 1612. After running checks of the defendant's license, registration, and proof of insurance, as well as a records check of the passenger, the officer wrote a warning ticket for driving on the shoulder of the road. *Id.* By 12:28 a.m., the officer had finished explaining the warning to the defendant and had given both occupants back all of their documentation. *Id.* After the officer had completed all of his business related to the stop of the vehicle, he sought permission to walk his narcotics canine around the vehicle. *Id.* When the defendant refused to consent to the canine sniff, the officer instructed the defendant to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for a second officer. *Id.* At 12:33 a.m., a second officer arrived and a canine sniff was conducted of the exterior of the vehicle. *Id.* The canine alerted to the presence of drugs. A subsequent search of the vehicle revealed a large bag of

8

methamphetamine. *Id.*

The *Rodriguez* Court recognized that in *Illinois v. Caballes*, 543 U.S. 405 (2005), it held that a canine sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription against unreasonable seizures. *Id.* at 1612. The Court observed, however, that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket." *Id.* at 1614–15 (quoting *Caballes*, 543 U.S. at 407); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (stating that the seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop").

Gonzalez relies on *Rodriguez* to support his argument that the stops of both the Jeep and the Honda were unreasonably prolonged by the canine sniff conducted after traffic warnings were given to both drivers. ECF No. 182 at 3–4. Assuming without deciding that Gonzalez even has standing to contest the traffic stops, the Court nevertheless concludes that the canine sniffs of the vehicles were not unlawful. Similar to *Rodriguez*, this case involved a traffic stops for minor violations, and the tickets/warnings had been issued by the time the canine sniff of the vehicles occurred. In *Rodriguez*, however, the driver of the vehicle explicitly declined to give consent to search his vehicle. 135 S. Ct. at 1613. Here, both the driver and passenger of each car gave explicit consent to search the vehicles. Even though the troopers may have completed all of the business related to the traffic stop prior to the canine sniff, any prolonged detention of the vehicles and passengers was consensual. Indeed, Gonzalez does not argue that the consent given by the occupants was invalid. Because any prolonged detention of the vehicles and/or passengers was consensual, the troopers did not violate Gonzalez's Fourth Amendment rights. *See United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) ("Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something

that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention or unless the continued encounter is consensual." (quoting *United States v. Barragan*, 379 F.3d 524, 528–29 (8th Cir. 2004))).

**B.     Search warrants**

**1.     Warrants to search 2008 Jeep Liberty and 2003 Honda Odyssey**

Gonzalez argues that probable cause did not exist to justify issuing warrants to search both the 2008 Jeep Liberty and the 2003 Honda Odyssey. ECF No. 146 at 1. Assuming without deciding that the search warrants lacked probable cause, the Court concludes that the evidence is nonetheless admissible under the good-faith exception to the exclusionary rule as articulated in *United States v. Leon*, 468 U.S. 897, 922 (1984). *See also United States v. Clay*, 646 F.3d 1124 (8th Cir. 2011) ("[T]he exclusionary rule should not be applied so as to bar the admission of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, even if that search warrant is later held to be invalid." (citing *Leon*, 468 U.S. at 900)).

The Eighth Circuit has outlined four situations where an officer's reliance on a warrant would be unreasonable: (1) the officer included information in the affidavit that he knew was false or would have known was false except for his reckless disregard of the truth; (2) the affidavit is so lacking in probable cause that it is objectively unreasonable for the officer to rely on it; (3) the judge failed to act in a neutral and detached manner; or (4) the warrant is so facially deficient that the officer cannot reasonably presume the warrant to be valid. *United States v. Phillips*, 88 F.3d 582, 586 (8th Cir. 1996) (citing *Leon*, 468 U.S. at 922). None of these situations are applicable here.

Both the Jeep and the Honda were searched on two separate occasions, three days apart. *See* Gov. Exs. 1, 2, 4, and 5. Officer Kathleen Brown of the St. Paul Police Department submitted all four affidavits in support of the warrants. Brown is a member of the FBI Safe Streets Task Force

("SSTF").

The affidavits in support of the first warrants to search the Jeep and Honda are nearly identical. Brown stated that during the course of a SSTF investigation into methamphetamine distribution in the Twin Cities, she received information that a 2008 Jeep Liberty registered to Gonzalez (3xxx Humboldt Ave, Minneapolis, MN) was involved in transporting narcotics in the St. Paul area. Officers also received information that the Jeep had traveled to Arizona, a known source of illegal narcotics, on April 9, 2015, and the Jeep was returning to Minnesota on April 20, 2015. The affidavit in support of the warrant to search the Jeep outlined the aforementioned information concerning the traffic stop of the Jeep and the positive canine alert for narcotics. Brown also noted Trooper Flanagan's observation that several pieces of the interior molding of the Jeep showed signs of tampering. The affidavit in support of the warrant to search the Honda also discussed the traffic stop of the Honda and the positive canine alert for narcotics. Brown averred that officers obtained license plate reader records that showed the Jeep and Honda passed the same reader in Arizona seven seconds apart on April 19, 2015, indicating that the vehicles were traveling in tandem. *See* Gov. Exs. 1 and 4.

As to the affidavits in support of the warrants to search the vehicles a second time, Brown stated that the initial search of the Honda uncovered 26 individually wrapped packages in the rear panels of the van. Bolts were holding the panels in place. A field test of one of the packages tested positive for methamphetamine. Two days after the search, Brown received Trooper Flanagan's report of the traffic stop and learned that there was a socket tool set located in the Jeep, and one of the sockets appeared to have been used as there was grease on it. Based on this information, Smith stated that she believed additional evidence of narcotics trafficking would be found in the vehicles (namely, tools used to open secret compartments). *See* Gov. Exs. 2 and 5.

It is clear to the Court that this is not a situation where the supporting affidavits were so devoid of factual support that it would be objectively unreasonable for a law enforcement officer to rely on it. *Cf. United States v. Herron*, 215 F.3d 812 (8th Cir. 2000) (concluding that the good-faith exception did not apply where the affidavit at issue contained no facts that the defendant was involved in marijuana activities or that such activities were occurring on the premises searched). The record does not support a finding that the officer's reliance on the warrants was unreasonable under *Leon*. There is also no evidence that the officer included false information in the warrant applications, that the judge failed to act in a neutral manner, or that the warrants were so facially deficient it would be unreasonable for an officer to rely on it. To the extent Gonzalez's motion seeks to suppress evidence obtained pursuant to warrants authorizing both searches of the Jeep and the Honda, the motion must be denied.

## 2.        **Warrant to search laptop computer**

Gonzalez argues that probable cause did not exist to justify issuing a warrant to search a Compaq Presario laptop computer discovered during the April 20, 2015 search of the Jeep Liberty. ECF No. 146 at 1. Assuming without deciding that the search warrant lacked probable cause, the Court concludes that the evidence is nonetheless admissible under the good-faith exception to the exclusionary rule as articulated in *Leon*, 468 U.S. at 922. Brown's affidavit in the support of the warrant to search the laptop outlined many of the aforementioned facts, including: (1) the controlled purchase of methamphetamine on March 24, 2015 that involved the Jeep, (2) the Lacoste store surveillance video of Gonzalez making a purchase that was linked to a receipt found in the bag containing methamphetamine received during the controlled buy, (3) the GPS tracking of the Jeep traveling from Arizona to Minnesota, (4) the April 20, 2015 traffic stop of both the Jeep and the Honda, (5) the positive canine alert to narcotics during the traffic stops, and (6) the discovery of 26

bundles of methamphetamine in the Honda. According to Brown's training and experience, individuals who sell and distribute narcotics electronics, including computers, to communicate with individuals involved in their drug trafficking operation. *See* Gov. Ex. 3.

Based on the foregoing, it is clear that this is not a situation where the supporting affidavit was so devoid of factual support that it would be objectively unreasonable for a law enforcement officer to rely on it. The record lacks any indication that the officer's reliance on the warrant was unreasonable under *Leon*. To the extent Gonzalez's motion seeks to suppress evidence obtained from the warrant to search the Compaq laptop computer, the motion must be denied.

### 3. Warrant to search Gonzalez's residence

Next, Gonzalez argues that probable cause did not exist to justify issuing a warrant to search Gonzalez's residence located at 3xxx Humboldt Avenue North in Minneapolis, MN. ECF No. 146 at 2. Assuming without deciding that the search warrant lacked probable cause, the Court concludes that the evidence is nonetheless admissible under the good-faith exception to the exclusionary rule as articulated in *Leon*, 468 U.S. at 922. Sergeant Dylanger Flenniken of the St. Paul Police Department submitted the affidavit in support of the warrant application. *See* Gov. Ex. 6. Flenniken is a member of the SSTF.

Flenniken's affidavit outlined many of the previously-discussed facts, including: (1) the controlled purchase of methamphetamine between Nava-Navarette and the undercover officer that involved the Jeep registered to Gonzalez, (2) the Jeep's return to the Humboldt Avenue address following the controlled purchase, (3) the GPS tracking of the Jeep from Arizona to Minnesota, (4) the April 20, 2015 traffic stop of both the Jeep and the Honda, (5) the fact that the Honda was registered to Alfonso Ayala, Jr. with an address of 3xxx Humboldt Avenue North, (6) the positive canine alert to narcotics during the traffic stops, and (7) the discovery of 22 pounds of

13

methamphetamine hidden within the Honda. *See* Gov. Ex. 6.

Based on the foregoing, it is clear that this is not a situation where the supporting affidavit was so devoid of factual support that it would be objectively unreasonable for a law enforcement officer to rely on it. The record lacks any indication that the officers' reliance on the warrant was unreasonable under *Leon*, especially given the drug transactions and trafficking involved with vehicles registered to the 3xxx Humboldt Avenue address. To the extent Gonzalez's motion seeks to suppress evidence obtained from the warrant to search his residence, the motion must be denied.

### 4.    Warrant to search Gonzalez's Facebook information

Finally, Gonzalez argues that probable cause did not exist to justify issuing a warrant to search his Facebook information. ECF No. 146 at 2. Assuming without deciding that the search warrant lacked probable cause, the Court concludes that the evidence is nonetheless admissible under the good-faith exception to the exclusionary rule as articulated in *Leon*, 468 U.S. at 922. Brown's affidavit in the support of the warrant stated that as part of the SSTF's investigation of a narcotics distribution network, Gonzalez was determined to be the leader of a drug trafficking organization which transported methamphetamine from Arizona to Minnesota. Gov. Ex. 7. She then discussed the April 2015 traffic stop of the Jeep and Honda and the fact that 22 pounds of methamphetamine were discovered in the Honda. *Id.* According to Brown, law enforcement determined that Gonzalez used Facebook as a means of communication with persons associated with his distribution network. *Id.* Specifically, Gonzalez used accounts under the name "Edward Molina" and "Junior Molina" and is "friends" with co-Defendant Candela, who allegedly helped orchestrate the delivery of the methamphetamine discovered after the April 2015 traffic stop. *Id.* In Brown's training and experience, she knew that records stored or managed by social networking providers may contain information which can assist in discovering evidence to prove possession of narcotics

with intent to distribute. *Id.*

Based on the foregoing, it is clear that this is not a situation where the supporting affidavit was so devoid of factual support that it would be objectively unreasonable for a law enforcement officer to rely on it. The record lacks any indication that the officers' reliance on the warrant was unreasonable under *Leon*. To the extent Gonzalez's motion seeks to suppress evidence obtained from the warrant to search his Facebook records, the motion must be denied.

## IV. RECOMMENDATION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's motion to suppress evidence (ECF No. 146) be **DENIED**.


DATED: January 19, 2016                          *s/Franklin L. Noel*
                                                 FRANKLIN L. NOEL
                                                 United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 2, 2016**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **February 2, 2016** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.